# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| vs. | : | **CRIMINAL NO. 08-280-1** |
| | : | |
| **MAURICE RAY DUPREE,** | : | |
|             **Defendant.** | : | |
| | : | |

### MOTION TO SUPPRESS EVIDENCE
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**RUFE, J.**                                                                                                                                 **May 27, 2009**

       The Indictment in the above-captioned case charges Defendant Maurice Dupree ("Defendant" or "Dupree") with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Defendant has filed a Motion to Suppress all physical evidence recovered in connection with his arrest on January 16, 2008.[1] Upon consideration of Defendant's Motion, the Government's Response in opposition,[2] and an evidentiary hearing and oral argument held thereon,[3] the Court enters the following findings of fact and conclusions of law:

### I. FINDINGS OF FACT

1.     On the evening of January 16, 2008, Philadelphia Police Officers Brian Mabry ("Mabry") and Steven Shippen ("Shippen") (collectively, "the officers") were on patrol duty in the 23rd Police District of Philadelphia in the area of the intersection of 18th Street and Cecil B. Moore Avenue. The officers were in uniform, with Shippen driving, and Mabry riding in,

---

[1] Doc. No. 25.

[2] Doc. No. 28.

[3] See Doc. No. 33 (Transcript of suppression hearing held on February 2, 2009 ("Tr.")).

1

a marked radio patrol car.

2. At approximately 7:00 p.m., the officers received a radio report, or "flash information" ("flash"), that a black male ("suspect"), approximately five feet, eight inches in height, wearing blue jeans and a black hooded sweatshirt, or "hoody," had fired gunshots in the area of 10th and Oxford Streets.[4]

3. The flash included no further description of the suspect. The officers never received additional information as to the suspect's physical appearance.

4. The officers knew from the flash that it had been issued at the direction of the commanding officer of Philadelphia's 19th Police District.[5] However, the officers did not know the source of the tip or report underlying the flash.[6] Further, no evidence was received as to when, relative to the time at which the flash was issued, the shots were reported to have been fired.

5. Soon after the flash issued, the officers received an additional radio report that the suspect had fled eastbound on Oxford Avenue.[7] The report did not state the suspect's manner of flight, i.e., whether the suspect had fled on foot, in a vehicle, on a bicycle or by some other means.

6. Upon hearing the flash, the officers rapidly drove the approximately ten blocks south and east to 10th and Oxford Streets. At the intersection of 12th and Oxford Streets, Shippen slowed the vehicle to a patrolling speed. The officers crossed 10th Street heading eastbound on

---

[4] Tr. at 8:23-25; 34:1-35:1.

[5] Tr. at 8:20.

[6] Tr. at 52:9.

[7] Tr. at 80:6-9.

Oxford, looking for the suspect. They observed little vehicular or pedestrian traffic, and found the area well-lit by streetlights and residential properties. The officers continued driving east on Oxford until they crossed Marshall Street, which is situated between 7th and 6th Streets as one proceeds east.[8]

7. On Marshall Street north of Oxford, Mabry saw an individual who he believed matched the description of the suspect.[9] The individual was wearing a dark hooded sweatshirt and jeans, and was riding a bicycle slowly in a southerly direction, toward Oxford.[10] The individual on the bicycle was in fact Defendant Dupree.

8. Shippen had noticed Dupree on Marshall Street as well, but had not "pa[id] attention" because Dupree was riding a bicycle, and the flash and additional reports had included no mention of a bicycle.[11] Shippen continued past Marshall on Oxford.

9. Mabry then told Shippen he had seen an individual on Marshall Street matching the suspect's description.[12] Shippen, who had driven a few feet past Marshall, stopped the patrol car, shifted into reverse, backed up and then turned north onto Marshall, driving approximately five miles an hour.[13]

10. The officers drove north on Marshall Street toward Dupree, who continued to ride slowly on

---

[8] The record evidence (and any City map) shows that Marshall crosses Oxford seven blocks east of 10th Street; from 10th Street running east, the intervening cross-streets are: Hutchinson, 9th, Darien, 8th, Perth, Franklin, 7th, and Marshall. Tr. at 38:4.

[9] Tr. at 13:14-15.

[10] Tr. 38:24, 95:7.

[11] Tr. at 82:6-23.

[12] Tr. at 14:16-17.

[13] Tr. at 61:12-20.

the bicycle south toward the officers' approaching vehicle.[14]

11. Shippen stopped the patrol car diagonally on Marshall Street, several feet north of Oxford Street, and just past Dupree.[15]

12. Mabry immediately exited the patrol car and approached Dupree, who was still riding the bicycle.[16] Quickly drawing alongside Dupree, and without first speaking, Mabry grabbed Dupree with both hands, one hand holding Dupree's right elbow, the other gripping Dupree's right upper arm.[17] While gripping Dupree's arm, Mabry said "Can I talk to you for a minute?"[18] Dupree was still astride the bicycle. Shippen had emerged from the patrol car and approached Dupree as well.

13. By grabbing him, Mabry stopped Dupree's movement.[19] Mabry testified that, "at that point he was stopped for investigation."[20]

14. To that point in time, the officers had not observed Dupree with a weapon, and they had not observed him engaging in any sort of criminal activity.[21]

15. Mabry had held and stopped Dupree for approximately two seconds before Dupree twisted away from Mabry, breaking Mabry's grip on him, and jumped off the bicycle, sliding it into

---

[14] Tr. at 64:24-25.

[15] Tr. at 65:3-4.

[16] Tr. at 40:3.

[17] Tr. at 41:18.

[18] Tr. at 42:10-11.

[19] Tr. at 41:13-14.

[20] Tr. at 42:1.

[21] Tr. at 40:10-18; Tr. at 94:16-19.

4

Mabry's legs.[22]

16. Dupree ran eastbound then southbound through the area, away from the officers.[23] Mabry and Shippen chased Dupree on foot, running approximately ten feet behind him.[24]

17. The officers chased Dupree continuously for several minutes, always remaining within several feet of him. He circled a particular property on Marshall Street numerous times with the officers in close pursuit. At a certain point, Mabry saw Dupree slow down and reach toward his waistband at his left hip with his right hand.[25] The officers slowed and started to draw their weapons. Mabry saw light glint off of a metallic object in Dupree's right hand, and then saw Dupree "dump" the object into a flower pot.[26]

18. Mabry stopped to recover the object. It was a loaded, nickel-plated Smith & Wesson .357 caliber revolver. It was the gun which Dupree is now charged with possessing illegally.

19. Shippen continued to chase Dupree, catching up to him shortly and tackling him to the ground. The two men struggled before Shippen subdued Dupree with some assistance from Mabry. The officers then placed Dupree under arrest.

## II. DISCUSSION OF APPLICABLE LAW

Dupree alleges his Fourth Amendment rights were violated when the officers first

---

[22] Tr. at 19:8-9.

[23] Tr. at 20:13-15.

[24] Tr. at 21:12.

[25] Tr. at 23:11-12.

[26] Tr. at 24:1-2.

stopped him because they had no proper justification for doing so.[27]  Dupree claims that the allegedly unlawful stop led directly to the forced abandonment of the firearm presently at issue.  Because it was gathered as a direct result of an unlawful seizure, Dupree argues, the Court should suppress the gun found by Mabry on January 16, 2008 under the "fruit of the poisonous tree" doctrine.[28]  Dupree's suppression argument is predicated on the Court finding as a threshold matter that an unlawful seizure occurred when Mabry initially grabbed Dupree in the street.[29]  It is undisputed that the Government has the burden to prove by a preponderance of the evidence that any warrantless seizure that occurred was lawful.

The Fourth Amendment to the United States Constitution prohibits "unreasonable . . . seizures."[30]  It does not prohibit consensual encounters between police and citizens.[31]  Here, the parties dispute not whether Dupree was seized during his encounter with the officers, but when.  Dupree argues that he was seized when initially grabbed by Mabry on Marshall Street, while the Government asserts that Dupree was seized only when Shippen ultimately tackled him after the minutes-long foot chase, because that is when he came under the officers' control.  In United States

---

[27] The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by an oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV.

[28] See Wong Sun v. United States, 371 U.S. 471 (1963).

[29] See id.

[30] U.S. Const. amend. IV.

[31] Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion) ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"); see also United States v. Gholson, 181 Fed. Appx. 299, 301 (3d Cir. 2006) (same).

v. Brown, the Third Circuit established that a "seizure" occurs for Fourth Amendment purposes when there is "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."[32] The Brown court added: "[p]ut another way, when a seizure is effected by even 'the slightest application of physical force,' it is immaterial whether the suspect yields to that force."[33] Under Brown, it is clear that Dupree was seized within the meaning of the Fourth Amendment when Mabry first approached him on Marshall Street and grabbed him with both hands, temporarily stopping his movement.

The Court must next assess whether this seizure was reasonable. To be reasonable, a seizure must generally be supported by a warrant based on probable cause.[34] It is undisputed that Mabry had no warrant to seize Dupree. A warrantless arrest is permissible only in circumstances where, based on objective facts known to the arresting officer, probable cause exists to believe that the arrestee has committed an offense.[35] This exception is not implicated by the initial seizure of Dupree because both officers testified that at no time prior to Dupree's seizure by Mabry did they know objective facts or observe conduct that caused them to believe that Dupree had committed an offense.[36]

At issue, then, is the other narrow exception to the warrant requirement in which "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the

---

[32] United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).

[33] Brown, 448 F.3d at 245 (quoting Hodari D., 499 U.S. at 625-26).

[34] United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002).

[35] United State v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984).

[36] Tr. at 40:10-18; Tr. at 94:16-19.

7

officer has a reasonable, articulable suspicion that criminal activity is afoot" ("Terry stop").[37] A police officer's "mere 'hunch' or 'inchoate and unparticularized suspicion'" of criminal activity does not suffice to justify an investigatory stop, rather, a "particularized and objective basis" for the belief underlying the stop is required.[38] A court evaluates the objective basis for a stop in light of the totality of the circumstances surrounding it.[39]

The Court begins its Terry analysis by noting that the Government has conceded in writing and at oral argument that the officers did not have reasonable suspicion to stop Dupree when they seized him on Marshall Street – a concession made tenable by the Government's theory, rejected above, that Dupree was not seized for Fourth Amendment purposes until he was tackled by Shippen.[40] Dupree makes the conceded point as well. The Government's concession is significant but not controlling in the Court's evaluation of the issue. Proceeding to that evaluation, it is undisputed that the officers initially stopped Dupree solely because Mabry believed Dupree matched the description of the suspect described in the flash and subsequent reports. These reports described a black male of medium height wearing blue jeans and a dark hooded sweatshirt fleeing eastbound from 10th and Oxford Streets, but contained no other descriptive information. It is also undisputed

---

[37] Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

[38] United States v. Brown, 159 F.3d 147, 149 (3d Cir. 1998).

[39] United States v. Nelson, 284 F.3d 472, 477-78 (3d Cir. 2002); Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).

[40] February 12, 2009 Letter of Laurie Magid, U.S. Attorney for the Eastern District of Pennsylvania, at 2 ("Had [Officers Mabry and Shippen] subjected the defendant to a Terry pat-down search and recovered the handgun [when they initially encountered him], the government concedes suppression is warranted"); Tr. at 100:14-101:14 (Government counsel: "I think the case really rises and falls on that initial encounter . . . . I agree with counsel that the initial flash information is wanting[,] in light of the Supreme Court's decision in Florida v. J.L. . . . . But, now a question we have before us this morning is whether or not the defendant was seized on Marshall Street. If we can say that at this point in time the defendant was arrested, the case ends . . . . The problem we have here is that the arrest did not occur on Marshall Street, but occurred [when Shippen later tackled Dupree]").

that the officers did not know the source of the information in the flash, that is, they had no knowledge of the person who originally reported the information to the police, let alone any knowledge of that person's veracity. Finally, no evidence appears showing that the officers received information as to exactly when the shots reported in the flash were fired.

Where the primary basis for a Terry stop is an unknown informant's tip, a court must find that "the content of the tip . . . provide[s] a particularized and objective basis for suspecting the particular person stopped of criminal activity."[41] This rule was established by the United States Supreme Court in Florida v. J.L., in which an investigative stop of a young black male wearing a plaid shirt at a particular bus stop was held to violate the Fourth Amendment where the only basis for the stop was a radio report based on an anonymous telephonic tip to police that a young black male wearing a plaid shirt at the bus stop in question possessed a gun.[42] The Court stated that reasonable suspicion was lacking because "the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made . . . by an unknown caller," and stated further that to engender reasonable suspicion justifying an investigative stop, a tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person."[43]

Additionally, other, somewhat overlapping factors which courts in this Circuit may assess when evaluating whether a stop was supported by reasonable suspicion include:

> (1) the reputation of the area in which the stop occurred for criminal activity; (2) the time of day; (3) the geographical and temporal proximity of the stop to the scene of an alleged crime; (4) the number of persons in the area; (5)

---

[41] United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006) (citing Florida v. J.L., 529 U.S. 266, 272 (2000)).

[42] J.L., 529 U.S. at 266-71.

[43] Id. at 272.

9

> whether, even if anonymous, . . . informant(s) communicated by telephone call or in person to officers; (6) the timing, quality and content of the information communicated by informants; (7) any exigent circumstances . . . ; and (8) the behavior of the defendant when police came into his vicinity.[44]

Considering the foregoing factors as applicable to this case, the Court agrees with the parties that the flash report, combined with Dupree's observed conduct, did not supply the officers with a proper basis for the initial stop.

Dispensing with the first factor, no evidence exists in this record as to the reputation of the area of Marshall and Oxford Streets for criminal activity.[45] Next, the time of day of the interaction at issue – approximately 7:00 p.m. – was not at all late, and hence could not support a finding of reasonable suspicion.[46] As for the third factor, the temporal proximity of the officers' initial observation and seizure of Dupree to the time the shots were fired has not been established through record evidence, while the geographical proximity of the reported shots to Marshall Street, approximately seven blocks away, is not so close as to have much significance. Next, the Court finds that in the circumstances of this case, the fact that no other people were in the area of Marshall and Oxford Streets is at best moderately significant or supportive of reasonable suspicion, and is weakened somewhat by the indeterminate timing of the shots fired relative to the flash information and the officers' eventual sighting of Dupree as well as the distance between the site of the reported shots and Marshall Street.

---

[44] United States v. Fogle, 515 F. Supp. 2d 474, 484-85 (D.N.J. 2007) (citations omitted).

[45] The Government presented no evidence to this point, and while the Court has certain generalized knowledge as to the reputation of some areas of the City of Philadelphia for a high crime rate, it declines to inject a finding *sua sponte* in this case on the same.

[46] See Brown, 448 F.3d at 251 ("[a] suspect's presence on a street at a late hour" may suggest suspicious behavior or "serve to corroborate an otherwise insufficient tip") (citing Adams v. Williams, 407 U.S. 143, 147-48 (1972) and other cases omitted here).

Regarding the nature of the report to which the officers responded and the tip that underlay it, which relates to the fifth and sixth factors, the Court focuses first on the content of the tip to determine whether it "provide[d] a particularized and objective basis for suspecting the particular person stopped of criminal activity."[47] The officers did not know the source of the tip when they acted on it, although the police officer who received or broadcast it may have, and thus the Court does not treat the tip as either anonymous or coming from a known source.[48] The Third Circuit, reviewing multiple cases involving tips received in a variety of different circumstances, has established generally that:

> [t]he following specific aspects of tips indicate reliability:
>
> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
>
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
>
> (3) The content of the tip is not information that would be available to any observer. A not truly anonymous tip is accorded greater weight when the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not the general public, and the tip could not have been generated by the general public, nor based solely on observation.
>
> (4) The person providing the information has recently witnessed the alleged criminal activity.

---

[47] Goodrich, 450 F.3d at 560 (citing J.L., 529 U.S. at 272).

[48] See United States v. Hensley, 469 U.S. 221, 233 (1985) (ruling that when "the police make a Terry stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop."). No evidence regarding what the police who issued the flash report in question knew or believed has been presented to the Court. Accordingly, the Court considers the content of the report but not its source. Nelson, 284 F.3d at 481 (where Terry stop effectuated based on broadcast description, "the reasonableness of the stop . . . depends on the reliability of the tip itself.").

11

> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility. Predictive information is also useful in that it can reflect particularized knowledge.[49]

The first, second and fourth points are inapplicable here since the tip's source was unknown to the officers when they seized Dupree. As for the third factor, the Court finds that the information in the flash report was of a highly general, descriptive quality and would have been available to any observer.[50] With respect to the fifth point, the information received contained only minimal predictive content, in that it told of a person fleeing east from Tenth and Oxford Streets and Dupree was eventually encountered to the east of that intersection. But this predictive content is too general, and its correspondence to what the officers actually encountered – Dupree several blocks away to the east riding south on a bicycle – too attenuated, to be significant. Thus, the Court does not view the information received by the officers as particularly reliable. Moreover, as compared with what the officers initially observed of the defendant, the information did not provide a basis for suspecting Dupree of criminal activity. The similarities between the flash description and Dupree's appearance were limited to rather generic clothing – jeans and a dark hooded sweatshirt – that would be commonplace on a midwinter's evening. Meanwhile, notable differences appear. Dupree was first observed riding a bicycle, but the flash report did not mention a bicycle. Dupree was traveling south on Marshall toward Oxford Street, heading, in effect, *toward* the alleged crime scene which lay to the south and west on Oxford. However, the flash report described the suspect's eastbound flight from Oxford. The limited correspondence between the flash information and the officers'

---

[49] Brown, 448 F.3d at 249-50 (citations and quotations omitted).

[50] See id. at 247-48 (ruling that police radio report describing "Afican-American males between 15 and 20 years of age, wearing dark, hooded sweatshirts and running south on 22nd Street, where one male was 5'8" and the other was 6'" was a "most general of descriptions" that failed to satisfy the "Fourth Amendment's demand for specificity" in a description set forth as the justification for a Terry stop).

12

observations of Dupree also must be considered alongside the fact that Dupree's conduct did not suggest to the officers that he possessed a gun or was engaged in criminal activity.[51] The officers stated as much in their testimony to the Court.[52] Indeed, it appears Dupree rode his bicycle south on Marshall Street in the same fashion from the moment the officers first observed him until the moment when he was bodily stopped by Mabry. Considered objectively, this conduct suggests nothing that might give rise to reasonable suspicion to subject Dupree to a Terry stop. Thus, Dupree's observed conduct did not increase whatever scintilla of justification the officers had to stop Dupree based on the flash report alone. Accordingly, the Court concludes that the seizure in question was unlawful because it was not supported by reasonable suspicion or probable cause.

"Under the 'fruit of the poisonous tree' doctrine first enunciated in Wong Sun v. United States, evidence gathered as a result of an unlawful . . . seizure must be suppressed at trial."[53] Moreover, "when the abandonment of property is precipitated by an unlawful seizure, that property also must be excluded."[54] Again, the Court notes the Government's concession that if the initial stop of Dupree is found to have been a seizure, then the gun must be suppressed as the seizure's illegal proceeds.[55] The Court agrees, finding that Dupree's flight from the officers and abandonment of the

---

[51] This fact relates directly to the eighth factor seen previously, regarding the behavior of the defendant when police came into his vicinity, and indirectly to the seventh factor, regarding exigent circumstances, in that Dupree gave no indication of fleeing from the police when they first observed him, then changed direction and approached him on Marshall Street.

[52] Tr. at 40:10-18; Tr. at 94:16-19.

[53] United States v. Coggins, 986 F.2d 651, 653 (3d Cir. 1993) (citing Wong Sun, 371 U.S. 471).

[54] Coggins, 986 F.2d at 653 ; see also United States v. Wilson, 953 F.2d 116, 127 (4th Cir. 1991) (same); United States v. Beck, 602 F.2d 726 (5th Cir. 1979) (same).

[55] February 12, 2009 Letter of Laurie Magid, U.S. Attorney for the Eastern District of Pennsylvania, at 2 ("Had [Officers Mabry and Shippen] subjected the defendant to a Terry pat-down search and recovered the handgun [when they initially encountered him], the government concedes suppression is warranted"); Tr. at 100:14-101:14

13

firearm at issue during that flight was the direct result of an unlawful seizure. Immediately after being seized by Mabry and then twisting free from the officer's grip, Dupree fled on foot with both Mabry and Shippen in continuous hot pursuit, running some ten feet behind him. Dupree's flight and the officers' pursuit lasted ten minutes or less. While being chased in this fashion, Dupree drew the firearm from his waistband and discarded it into a flower pot from which it was promptly recovered by Mabry. There is simply no evidence of an intervening event that might mitigate the taint of the initial illegality. Rather, because Dupree was unlawfully seized in the first instance and such seizure directly precipitated his flight and abandonment of the firearm, the Court must "suppress[] the evidence of the [weapon] that [Dupree] discarded while fleeing with [the officers] in hot pursuit."[56]

### III. CONCLUSIONS OF LAW

1. Dupree was "seized" for purposes of the Fourth Amendment when, immediately after the officers stopped on Marshall Street, Officer Mabry grabbed him.

2. This seizure was not supported by probable cause or reasonable suspicion, and hence was "unreasonable" under the Fourth Amendment.

3. Dupree was seized notwithstanding the fact that he subsequently broke free of Officer Mabry's two-handed grip.

4. The unlawful seizure of Dupree precipitated Dupree's flight, Officer Mabry's and

---

(Government counsel: "I think the case really rises and falls on that initial encounter . . . . I agree with counsel that the initial flash information is wanting[,] in light of the Supreme Court's decision in Florida v. J.L. . . . . But, now a question we have before us this morning is whether or not the defendant was seized on Marshall Street. If we can say that at this point in time the defendant was arrested, the case ends . . . . The problem we have here is that the arrest did not occur on Marshall Street, but occurred [when Shippen later tackled Dupree]").

[56] Coggins, 986 F.2d at 653.

Officer Shippen's pursuit of the defendant, and the forced abandonment by Dupree of the firearm at issue in this Motion.

5. As such, the firearm must be suppressed as "fruit of the poisonous tree," that is, as evidence gathered as a direct result of an unlawful seizure.

## IV. CONCLUSION

For the foregoing reasons, Dupree's Motion to Suppress Physical Evidence will be granted. An appropriate Order follows.